James F. AGEE, Appellant,

v.

Chester HAMMONS, Appellee.

Sherman WALDEN, Appellant,

v.

Chester HAMMONS, Appellee.

Court of Appeals of Kentucky.

March 25, 1960.

Rehearing Denied June 17, 1960.

James E. Thompson, Richmond (Shackelford & Burnam, Richmond), for appellants.

Chenault & Coy, Richmond, for appellee.

PALMORE, Judge.

The appellants, James Agee and Sherman Walden, brought separate personal injury suits against the appellee, Chester Hammons, for personal injuries sustained by them when an automobile driven by Agee and in which Walden was a passenger collided head-on with an automobile driven by Hammons. The actions were consolidated for trial and resulted in a peremptory instruction for Hammons at the conclusion of the case for plaintiffs. The question on appeal is whether the directed verdict was proper. We have decided that it was.

The proceedings were begun in 1950 and, by appropriate order, have been conducted entirely under the rules of civil procedure in effect prior to July 1, 1953. Besides pleading a general denial and contributory negligence defendant asserted affirmatively a defense based on sudden emergency. Plaintiffs' general demurrer to the latter plea was overruled on the day of the trial (October 23, 1957) and counsel did not traverse it by reply. When plaintiffs rested their case defendant moved for a peremptory on the grounds not only that the evidence was insufficient to submit to the jury but also that plaintiffs had not traversed the material allegations of the sudden emergency plea. In directing a verdict accordingly the trial court at first relied on this latter technicality alone but later modified the ruling to cover the substantive ground as well.

█ Since the plea of sudden emergency was but a way of denying negligence, covered by the general denial, it did not require a traverse. The point requires no elaboration, however, because the motion for a peremptory was properly sustained on the basis of the insufficiency of the evidence to support a verdict for plaintiffs. ·

The accident happened at about 6:00 P.M., after dark, November 7, 1949, on the Richmond-Lancaster Pike south of Richmond in Madison County. Plaintiffs were traveling southwardly in their proper traffic lane at 35 to 40 m. p. h. Defendant, proceeding northwardly toward Richmond at about 45 m. p. h., swerved to the left to go around a truck that had just pulled in front of him out of a driveway on the east side of the road, and in so doing he collided head-on with the Agee car on the latter's side of the road. According to the occupants of defendant's car the truck backed into the highway in front of them, so as to face northwardly, Hammons cut to his left as quickly as he could to avoid it, and the accident occurred immediately. Two of

these witnesses testified that someone in the Hammons car yelled "Look out!" just before Hammons swerved to his left. Hammons testified that he did not have time to apply his brakes, which fact is inferentially supported by the testimony of the occupants of his car. Neither Hammons nor his passengers saw any lights on the Agee car, though they were in a position to do so if Agee's lights were on, the road being straight and the view unobstructed for some distance. Until the moment of the impact none of them saw the Agee car at all. The truck was not involved in the accident and fled the scene immediately.

The plaintiff Agee said that as he was driving along the highway he saw a set of headlights in front of him, which appeared "gradually" rather than "suddenly" (the choice of one or the other of these adverbs was required by the form of his counsel's question). He never saw any other lights or any other vehicle until just about the time he "got even" with the first mentioned lights, and at that moment another light or lights flashed in front of him, and he knew no more until he revived at the hospital two hours later. He was uncertain as to the distance between him and the first set of headlights when he first noticed them, but guessed it was about the length of the courtroom. The fair import of Agee's testimony in this respect is that there was nothing to cause him to pay extraordinary attention to the on-coming lights and that he really does not know how far off they were when he first became consciously aware of them.

In his deposition taken by defendant as if on cross-examination Agee had testified that his own headlights were on, but this vital question was omitted from his examination at the trial and the deposition was not introduced. Neither was his passenger, the plaintiff Walden, asked if the lights were on, and thus there was no evidence to the effect that they were.

The plaintiff Walden's testimony, fairly satisfactory on direct examination, was re-duced to a shambles on cross-examination. He testified that he saw the truck pull head first out of the driveway into the road when the Agee car was still some 200 feet north of the drive and that the truck had "ample time to straighten up and get in its own lane" (again, these are words put to the witness in the form of counsel's question, there being no suggestion of any reason why the truck might ever have been out of its own lane in the first place). Twice he said that the collision occurred about 100 yards, "maybe more or less," north of the driveway, which, of course, was not possible if the Agee car was within 200 feet of the drive when the truck entered the road.

On November 9, 1949, two days after the accident, and while he was in the hospital, Walden signed a statement prepared by defendant's counsel, who was investigating the case, in which he said that all he remembered about the accident was that he "saw some headlights coming right at us" and he "hit the floorboards." "I vaguely remember seeing a truck somewhere thereabouts. However, my recollection of the accident is too vague to furnish any further details." On January 4, 1950, he signed another statement, prepared by an insurance adjuster, stating that when the Agee car was about 200 feet from the drive a truck pulled head first out of the drive and turned north, that the Hammons car, also proceeding northward, tried to pass the truck and struck the Agee car in the latter's lane of traffic, and that the truck did not stop. (The identity of the truck was a serious question at the time, and this statement tended to absolve Bluegrass Hardware Co., the suspected owner of the truck, being also the employer of Walden and Agee).

On October 19, 1957, four days before the trial, in giving his deposition as if under cross-examination Walden testified positively that he had not seen "any truck or automobile back out of a driveway or pull out of a driveway" (answering "Absolutely not."), and:

"Are you positive you didn't see any automobile or other vehicle either back or pull out of an automobile, out of a driveway on Chester Hammons' side of the road, that is the opposite side of the road on which you were traveling?"

"There wasn't anything backed out of a driveway."

In that same deposition Walden testified categorically that at no time did he see any headlights but those of the car that collided with him and Agee, and that from his recollection "the only two motor vehicles that were on the highway at or near the scene of this accident at the time was the car of Agee and the car that collided with Agee's car" (answer: "That's right.").

No witness but the plaintiff Walden fixes the accident at any point except in the proximity of the driveway from which the truck emerged. Comparison of photographs taken of the Hammons car after it had been moved to the side of the road with photographs of the general scene indicates that the car was resting near a mail box on the west side of the highway a very short distance north of the point opposite the driveway entrance. Thus Walden's testimony is contrary to the physical facts.

█ Allowing for the long lapse of time between the accident and Walden's deposition, and disregarding whatever is unfavorable in the statement taken at the hospital, still the evidence given by Walden was in such serious conflict that in good conscience a verdict could not be allowed to rest upon it. Cf. Gohlinghorst v. Ruess, 1945, 146 Neb. 470, 20 N.W.2d 381; Bell v. Harmon, Ky.1955, 284 S.W.2d 812. Except for placing the accident on the west side of the road Walden's testimony was too equivocal to have probative value. See Lambert v. Miller's Adm'r, 1939, 277 Ky. 64, 125 S.W.2d 1019, 1023.

█ Even under the old rules of civil procedure we do not accept the proposition, suggested by defendant, that plaintiffs are "bound" by the uncontradicted testimony of defendant and his passengers because it was introduced by plaintiffs themselves. The question here is whether upon all the evidence heard by the jury prior to the motion for a peremptory a verdict for plaintiffs could have been sustained.

Plaintiffs take the position that under KRS 189.300 it is obligatory that the driver of an automobile stay on the right side of the road unless the left side is clear of traffic and presents a clear view for a distance of 150 feet; that the left side of the road was not clear; and that defendant was guilty of negligence per se. They cite McFarland v. Bruening, 1945, 299 Ky. 267, 185 S.W.2d 247, which in turn cites H. M. Williams Motor Co. v. Howard, 1933, 251 Ky. 557, 65 S.W.2d 688, as authority for that interpretation of the statute. Neither of those cases, however, can fairly be construed as authority for a rule so fixed and immutable that the theory of sudden emergency could never apply to an accident on the wrong side of the road. In fact, a sudden emergency instruction was given in the McFarland case, and one was denied in the H. M. Williams Motor Co. case only because the emergency plainly had been created by the party who sought to invoke the theory. In such cases the rule must be one of reason. See Tate v. Collins, 1936, 266 Ky. 322, 98 S.W.2d 938, and Pennington's Adm'r v. Pure Milk Co., 1939, 279 Ky. 235, 130 S.W.2d 24, for examples in which a defendant involved in an accident on the wrong side of the road after swerving to avoid striking a child or children was held entitled to a directed verdict. One who drives to the left of the road in a sudden emergency effort to avoid an accident may not be negligent even though he makes the wrong choice. See Edmiston v. Robinson, 1943, 293 Ky. 273, 168 S.W.2d 740.

█ In Vernon v. Gentry, Ky.1960, 334 S.W.2d 266, a *res ipsa loquitur* case, it was held that proof of an automobile's running off the highway and striking a tree

was sufficient evidence of negligence to take the case to the jury despite the driver's uncontradicted testimony that she was crowded off the road by an on-coming vehicle. The theory is that it was up to the jury to accept or reject her story (had the plaintiff corroborated the driver's story the result would, of course, have been different). However, whereas it is said in the Vernon case that according to common experience a car does not ordinarily run off the highway without negligence on the part of the operator, we do not believe the same can be said of an automobile's being involved in an accident on the wrong side of the road. If there are no explanatory circumstances in evidence, that the defendant was on the wrong side of the road would be enough to take a case to the jury by virtue of KRS 189.-300; but where all of the evidence is substantially consistent and shows conclusively that the driver acted in the face of a sudden emergency the fact that he was on the wrong side is not sufficient unless there are in evidence further circumstances from which the jury might deduce that he acted negligently. In such a case there is simply no showing of negligence.

The judgment is affirmed.